J-A10023-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| PATRICK J. NOLAN | : | No. 1467 EDA 2024 |

Appeal from the Order Entered May 8, 2024
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0001301-2023

BEFORE: PANELLA, P.J.E., BECK, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY PANELLA, P.J.E.: **FILED AUGUST 25, 2025**

The Commonwealth appeals from the order entered on May 8, 2024, granting Patrick J. Nolan's motion to suppress evidence.[1] The Commonwealth asserts the trial court erred in finding the police lacked reasonable suspicion to stop and frisk Nolan. We agree and therefore reverse and remand this matter for further proceedings consistent with this memorandum.

The following facts were obtained from the suppression hearing transcript and body camera footage. On January 31, 2023, Officer McCauley was in Kensington, a high crime area in Philadelphia. As Officer McCauley explained about Kensington: "it probably leads the city in most categories for

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] The Commonwealth has certified that the order granting suppression will terminate or substantially handicap the prosecution. **See** Pa.R.A.P. 311(d).

shootings, homicides, and arrests citywide." N.T. Suppression, 3/25/24, at 7. In the two years preceding this hearing, Officer McCauley made approximately 120 firearms arrests in that area of Kensington. ***See id.***

Officer McCauley and his partner were at that location, specifically searching in a convenience store, for a suspect in an armed robbery. ***See id.*** at 7-8. He and his partner received information that the suspect in the armed robbery "hangs out inside that store." ***Id.*** at 8. While in the store, Officer McCauley observed Nolan, whom he did not know at the time, with a firearm in his pocket. ***See id.*** Officer McCauley clearly testified as follows:

Q. Okay. And how did you end up in contact with the defendant?

A. At that time we went all the way back to the back of the store, Your Honor, and we went back to the store, I didn't see the actual—or I saw this male and I saw a firearm that was inside of his left jacket pocket. That's what brought me to his attention, I had no idea who he was, had no idea he would be in there.

Q. You were able to see the firearm?

A. I was able to see the firearm, yes.

***Id.*** Officer McCauley asked Nolan if he had a firearm, and Nolan responded he did not. ***See id.*** Officer McCauley asked if he could check, and Nolan said he could not. ***See id.***

Officer McCauley was speaking with Nolan as Nolan was walking past him and towards the front door of the store. ***See*** Exhibit C-1, Officer McCauley's body worn camera footage from January 31, 2023, at 1:01-1:11. Nolan quickly walked out of the store, with Officer McCauley multiple feet

behind him. **See id.** at 1:11-1:25. Nolan continued down the entrance ramp from the store's front door and nearly doubled the distance between himself and the officer by the time the officer made it outside the store. **Cf.** 1:24, 1:29. Nolan was already moving at a quick pace, and when Officer McCauley said "come here" Nolan broke into a full sprint away from Officer McCauley, into traffic. **Id.** at 1:26-1:32.

Nolan ultimately was caught by police officers approximately a half block away. Police found the firearm on Nolan and charged him with persons not to possess a firearm, firearms not to be carried without a license, and carrying firearms on public streets or public property in Philadelphia.[2] Nolan filed a motion to suppress arguing he was stopped by police without reasonable suspicion. The trial court held a hearing on March 25, 2024. After taking the matter under advisement, the trial court granted Nolan's motion and the Commonwealth appealed.

The Commonwealth raises one issue for our review:

Did the lower court err in granting [Nolan's] motion to suppress his firearm seized during a **Terry**[3] stop, where [Nolan] blatantly lied about carrying a gun and then fled in a high crime area, thereby establishing reasonable suspicion that he did not possess the gun legally?

Appellant's Brief, at 3.

---

[2] 18 Pa.C.S.A. §§ 6105(a)(1), 6106(a)(1), and 6108, respectively.

[3] **Terry v. Ohio**, 392 U.S. 1 (1968).

- 3 -

We begin with our well-established standard and scope of review:

> When reviewing an order granting a defendant's motion to suppress evidence, we are bound by that court's factual findings to the extent that they are supported by the record, and we consider only the evidence offered by the defendant, as well as any portion of the Commonwealth's evidence which remains uncontradicted, when read in the context of the entire record. Our review of the legal conclusions which have been drawn from such evidence, however, is de novo, and, consequently, we are not bound by the legal conclusions of the lower courts. Moreover, our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing.

*Commonwealth v. James*, 332 A.3d 859, 862-63 (Pa. Super. 2025) (citation omitted).

"The Fourth Amendment to the United States Constitution, incorporated to [the] states by and through the Fourteenth Amendment to the United States Constitution, and Article I, Section 8 of the Pennsylvania Constitution, protect citizens from unreasonable searches and seizures." *Commonwealth v. Barnes*, 296 A.3d 52, 56 (Pa. Super. 2023) (internal quotation marks and citation omitted). "However, not every encounter between a law enforcement officer and a citizen constitutes a seizure warranting constitutional protections." *James*, 332 A.3d at 863 (internal quotation marks, brackets, and citation omitted).

> We have long recognized three types of interactions that occur between law enforcement and private citizens. The first is a mere encounter, sometimes referred to as a consensual encounter, which does not require the officer to have any suspicion that the citizen is or has been engaged in criminal activity. This interaction also does not compel the citizen to stop or respond to the officer. A mere encounter does not constitute a seizure, as the citizen is free to choose whether to engage with the officer and comply with

any requests made or, conversely, to ignore the officer and continue on his or her way.

The second type of interaction, an investigative detention, is a temporary detention of a citizen. This interaction constitutes a seizure of a person, and to be constitutionally valid police must have a reasonable suspicion that criminal activity is afoot.

The third, a custodial detention, is the functional equivalent of an arrest and must be supported by probable cause. A custodial detention also constitutes a seizure.

No bright lines separate these types of encounters.

*Id.* (brackets and citation omitted).

In determining whether a citizen-police interaction constitutes a mere encounter or investigative detention, "we must consider all circumstances evidencing a show of authority or exercise of force, including the demeanor of the police officer, the manner of expression used by the officer in addressing the citizen, and the content of the interrogatories or statements." *Commonwealth v. Rice*, 304 A.3d 1255, 1260 (Pa. Super. 2023) (internal quotation marks and citation omitted). The moment a mere encounter turns into an investigative detention, the officer must possess reasonable suspicion. As our Court has explained:

Reasonable suspicion requires a finding that based on the available facts, a person of reasonable caution would believe the intrusion was appropriate.

Reasonable suspicion exists only where the officer is able to articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in

that activity. Therefore, the fundamental inquiry of a reviewing court must be an objective one, namely, whether the facts available to the officer at the moment of intrusion warrant a person of reasonable caution in the belief that the action taken was appropriate.

The question of whether reasonable suspicion existed at the time of an investigatory detention must be answered by examining the totality of the circumstances to determine whether there was a particularized and objective basis for suspecting the individual stopped of criminal activity. These circumstances are to be viewed through the eyes of a trained police officer.

In making this determination, we must give due weight to the specific reasonable inferences the police officer is entitled to draw from the facts in light of his experience. Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

Behavior indicative of the presence of a firearm contributes to the totality of the circumstances in determining whether there is reasonable suspicion to investigate further.

*Id.* at 1261 (dinkus, brackets, internal quotation marks, and citations omitted).

"Furthermore, it is well settled that unprovoked flight in a high crime area is sufficient to create a reasonable suspicion to justify an investigatory stop." *Commonwealth v. McCoy*, 154 A.3d 813, 819 (Pa. Super. 2017) (citations omitted). However, mere possession of a firearm, without more, does not provide reasonable suspicion of criminal activity. *See Commonwealth v. Hicks*, 208 A.3d 916, 937 (Pa. 2019). Possession of a

firearm can certainly be suspicious and "[a] police officer is entitled to view individuals' conduct in light of the probabilities that criminal activity may be afoot, and indisputably may draw certain common sense conclusions about human behavior." *Id.* at 938 (internal quotation marks and citation omitted).

With this background in mind, we turn to the facts at hand. The Commonwealth asserts Officer McCauley had reasonable suspicion when Nolan fled from the officers, unprovoked, in a high crime area. *See* Appellant's Brief, at 15-16. The Commonwealth notes the trial court failed to determine when the mere encounter escalated into an investigative detention. *See id.* at 9-10. The Commonwealth argues the interaction remained a mere encounter until Nolan fled from the officers. *See id.* at 10-11. We agree.

When the trial court announced its findings of fact, the trial court found: "The officers followed [Nolan] out of the store and had [him] stand behind a van, and then he took off running." N.T. Findings of Fact and Conclusions of Law, 5/8/24, at 4. Based upon these facts, the trial court concluded the officers violated *Hicks* because officers stopped Nolan based upon his mere possession of a firearm. *See id.* at 5.

The uncontradicted record includes Officer McCauley's body worn camera video footage. *See* Exhibit C-1. The trial court's factual findings are not supported by the uncontradicted record. At no point did the officers have Nolan stand behind a van.

Officer McCauley's body worn camera video footage began when he entered the store. *See* Exhibit C-1, at 0:01. Sound did not begin until approximately one minute into the video. *See id.* at 0:59-1:00. Officer McCauley started speaking with Nolan immediately upon the sound activating. *See id.* Nolan walked past Officer McCauley, who allowed him to leave. *See id.* at 1:07-1:11. Officer McCauley followed behind Nolan, at a distance. *See id.* at 1:11-1:26. Nolan moved quickly; he was not casually walking out of the store. *See id.* Officer McCauley, a trained police officer, stated at the time he was observing Nolan, "He's gonna run; he's gonna run." *Id.* at 1:26-1:28. Nolan nearly doubled the distance between himself and the officer by the time the officer made it outside the store. *Cf.* 1:24, 1:29. Nolan was already moving at a quick pace, and when Officer McCauley said "come here" Nolan broke into a full sprint away from Officer McCauley, into traffic. *Id.* at 1:26-1:32. In following Nolan after he ran, Officer McCauley, as the video of the body camera shows, put his own safety in jeopardy in order to protect the public.

The trial court failed to determine when the mere encounter turned to an investigative detention. Further, the trial court's factual findings are unsupported by the record. We are therefore not bound by the trial court's factual findings. *See James*, 332 A.3d at 862 (noting this Court is bound by the trial court's factual findings if supported by the record).

Based upon the uncontradicted body worn camera video footage, Nolan was detained at the time Officer McCauley yelled "come here." Exhibit C-1, at

1:26-1:32. Officer McCauley did nothing to provoke Nolan's flight. He merely asked a few questions and then let Nolan walk out of the store. Because Nolan fled, unprovoked in a high crime area, Officer McCauley had reasonable suspicion to chase and detain him.

*Hicks* does not compel the opposite result merely because Officer McCauley observed a concealed firearm in Nolan's pocket before Nolan fled from officers. Our Supreme Court in *Hicks* specifically noted that, while they were overruling the proposition that mere possession of a concealed firearm is sufficient for reasonable suspicion, they were not removing the standard totality of the circumstances analysis. *See Hicks*, 208 A.3d at 938-40, 951. The totality of the circumstances certainly may include the possession of a firearm, presence in a high crime area, and other "common sense conclusions about human behavior." *Id.* at 938. Certainly, possessing a concealed firearm and lying about that possession is suspicious. *See id.* (Our Supreme Court rejected the notion that "possession of a firearm can never be suspicious — it certainly can be.").

This is not a case where we are deciding whether possessing a firearm and lying about said possession, alone, established reasonable suspicion of criminal activity. Here, we have the observation of a concealed firearm, the individual lying about the possession, and then unprovoked flight in a high crime area. These factors combined provided the officer with reasonable suspicion to stop Nolan. *Hicks* is distinguishable, in that the video and audio

of Officer McCauley's body camera fully corroborate his testimony. There is no support in the suppression court's conclusion that Officer McCauley's sole ground for stopping Defendant was his "mere observance of Defendant carrying a concealed firearm . . . ." Trial Court Opinion, 7/29/24, at 7.

We therefore find the trial court erred in granting suppression, reverse the order granting suppression, and remand this matter for proceedings consistent with this memorandum.

Order reversed. Case remanded for further proceedings. Jurisdiction relinquished.

President Judge Emeritus Ford Elliott joins the memorandum.

Judge Beck files a dissenting memorandum.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/25/2025